Ryan North Miller, Esq.
Paul W. Kalish, Esq.
**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Tel: (609) 896-3600
Fax: (609) 896-1469
pkalish@foxrothschild.com

*Attorneys for Plaintiff Tektite Industries, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TEKTITE INDUSTRIES, INC.,<br><br>        Plaintiff,<br><br>              v.<br><br>SIRIUS SIGNAL, LLC,<br><br>        Defendant. | Civil Action No.<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Tektite Industries, Inc. ("Plaintiff" or "Tektite"), by and through its undersigned counsel, files this Complaint against Defendant Sirius Signal, LLC ("Defendant" or "Sirius"), and hereby states as follows:

**INTRODUCTION**

1.      This is an action arising under the United States Patent Act, 35 U.S.C. § 1 et. seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

2.      On April 19, 2024, Tektite received an email notification from Amazon that stated that Amazon had "received a report from a patent owner who believes the items listed at the end of this email infringe their U.S. Patent No. 10,227,114." This notice indicated that unless otherwise

determined by the Court, Tektite would need to submit to an Amazon APEX Proceeding to determine the question of infringement or its products would be removed from Amazon.com. The notice identified products sold under the ASIN [Amazon Standard Identification Number] B0CYCR3PRR and ASIN B0CY6JXXJT.  Both of these ASINs involve the sale of Tektite's SOSeFLARE product. In the notice, the patent owner's contact information was identified as "Sirius Signal Co." having an address at "1042 North El Camino Real, Suite B-200, Encinitas, CA 92024." A true and correct copy of this Amazon notice is attached hereto as **Exhibit A**.

3.      Tektite does not infringe any valid claim of U.S. Patent No. 10,227,114 (herein "the '114 Patent").

4.      In fact, Tektite's President Scott Mele ("Mele") is an inventor of several claims, including at least Claim 12, of the '114 Patent and therefore should be properly listed as a named inventor. Indeed, Sirius has previously acknowledged that certain electrical circuit designs that are claimed in Claim 12 came from Mele. If the failure to include Mele as an inventor was not a gross oversight, the only reasonable other explanation for not identifying Mele would be an intent to deceive the United States Patent and Trademark Office ("USPTO"). This explanation is further supported by Sirius's failure to identify material prior art, of which it was aware, during the prosecution of the '114 Patent and the related family of patent applications.

5.      Because an actual controversy exists as to whether Tektite infringes a valid claim of the '114 Patent and as to whether Mele should be listed as an inventor on at least the '114 Patent, Tektite requests a declaration that (i) the inventorship of the '114 Patent should be corrected to include Mele, and/or (ii) the claims of the '114 Patent are invalid or unenforceable, and/or (iii) Tektite's products do not infringe any valid claim of the '114 Patent.

## PARTIES

6.     Tektite is a New Jersey corporation with its principal place of business located at 309 North Clinton Avenue, Trenton, NJ 08638.

7.     Upon information and belief, Sirius Signal, L.L.C. is a California limited liability company with a principal place of business located at 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.

## JURISDICTION AND VENUE

8.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Patent Act, 35 U.S.C. § 100 *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiff's claims arise under the laws of the United States, namely, the Patent Act and Declaratory Judgment Act.

9.     This Court has personal jurisdiction over Defendant because Defendant has availed itself of this Court by (1) contracting with Plaintiff in New Jersey, (2) having its products manufactured in New Jersey for several years, (3) offering to sell and, upon information and belief, selling products to consumers in New Jersey, and (4) for initiating an Amazon proceeding against Plaintiff regarding infringement of its patent.

10.     Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims and damages to Plaintiff occurred in this District as a result of Defendant's conduct as alleged below.

## FACTUAL ALLEGATIONS

### Tektite

11.     Tektite is a U.S. based company that sells products made in the United States, and more specifically in New Jersey. Since its founding in 1990, Tektite has established itself as a

leader in the industry that specializes in the design, production, and sales of rugged, reliable outdoor, marine, security, and defense equipment.

12.     Tektite offers a wide range of high-quality strobes, signaling lights, and flashlights. It has been a pioneer in the industry for decades. For instance, in 1992, it introduced the world's smallest submersible strobe, Mark-Lite® strobe. Since then, it has introduced a number of firsts in the industry and procured a number of patents on its innovations.

13.     Indeed, prior to 2015, Tektite had a number of electronic visual distress signal devices (eVDSDs) on the market, including but not limited to its Strobe 3500 and TEKNA LITE 6 Strobe as well as other available light products, including but not limited to the NITE-FLIGHT light.

### Sirius

14.     Sirius Signal, LLC is a California corporation formed in March of 2015. Anthony Covelli ("Covelli") is listed as the agent on the California Secretary of State's website.

15.     Sirius launched its first eVDSD, the C-1001, in 2015, after it worked with Plaintiff to design the product.

16.     The C-1001 was based upon components of Tektite's Strobe 3500 and Nite-Flight light, which were products that were in production for years. These products were designed by Scott Mele.

### Tektite and Sirius Relationship

17.     In or around January to February 2015, Covelli approached Tektite to help in the design and manufacture of eVDSDs. Specifically, Covelli was looking for help integrating his optic into an eVDSD that could be marketed.

18.     Throughout February 2015, Tektite and Sirius worked to design a product that integrated Covelli's optic into Tektite's products. During that time, Mele discussed multiple of Tektite's products with Covelli, including the Strobe 3500, NITE-FLIGHT light, and TEKNA LITE 6 Strobe. In fact, Covelli specifically asked about the Strobe 3500 as a basis for their design work. Thereafter, Mele identified these and other products that included one or more features that could be incorporated into the design.

19.     By way of example, below is a photograph from February 2015 of Covelli's optic glued onto one of Tektite's Strobe 3500 products.



20.     Throughout the design process, Mele also disclosed third-party products/designs to Covelli.  For example, Mele discussed at least the following with Covelli: (1) U.S. Design Patent Nos. D205,973, which issued in 1966, (2) D210,587, which issued in 1968, (3) the SAF-T Beacon commercial product, (4) and the CARCLO Optics product. In fact, Mele sent Covelli drawings that showed the CARCLO product in the 2007-2011 timeframe and informed Covelli that his design looked similar to the CARCLO design.

21.     In early February 2015, Covelli, working with his electrical engineer, Richard Gunderson ("Gunderson"), proposed the below adaptation for the electrical components to Tektite's 3500 platform:



22.     In response, Mele suggested Sirius may want to use the LED module design he created and was using with his NITE-FLIGHT light—which had been on the market since 2010. Specifically, Mele suggested Sirius include the use of a metal support leg and a circuit board with a center hole thorough it. Notably, the TEKNA LITE 6 Strobe, which Mele and Covelli discussed, also included a post or pedestal based circuitry. Covelli accepted Mele's suggestion. Approximately two weeks later, Tektite sent a quote to Sirius outlining the work to tool an eVDSD that utilized Mele's proposed LED module with a metal support and the PCB serving as a battery contact. Notably, Mele also provided the below sketch of Tektite's contact board with a center hole therethrough.



23.     Mele also provided Covelli with module parts from Tektite's NITE-FLIGHT light. After receiving said module parts, Covelli asked for extra copies of these module parts along with the eVDSD bodies. Examples of the parts Covelli was asking Tektite for include the below:



24.     Also in February 2015, Mele sent Covelli and Gunderson emails related to the LED module where he made clear that an LED would have to be mounted on a circuit board before being "mounted on our post." Neither Covelli nor Gunderson disputed that the LED module design using a post was not Mele's.

25.     Mele asked Sirius for a sketch of the design Sirius intended to use because while he was under the impression the LED was not part of the PCB, he was curious if Sirius was able to make the onside of the board function as the battery contacts. In response, Gunderson acknowledged there was relatively little room in the cup (or eVDSD body) for a PCB and the components so they needed to use a battery contact PCB. Gunderson then provided a sketch of the assembly they planned to use (reproduced below), stating "[t]he Assembly is ***similar to the way you build your light*** with the exception of the control PCB mounted in between and glued in place." (emphasis added).



26.    Sirius also provided a photograph of Tektite's NITE-FLIGHT light's lamp module being used with Sirius's circuit board:



27.    As the finished product design started to come together in March 2015, the parties agreed to a mold engraving that identified patent markings that would be included on Sirius's

product. For example, on March 20, 2015 and in response to Mele's suggestion, Covelli emailed the following approval for the mold engraving, which notably included a marking for U.S. Patent Nos. D7202475 and 6,168,288 ("the '288 Patent") on the Model C-1001 product.

**Subject:** Re: Engraving text
   **Date:** Fri, 20 Mar 2015 08:17:43 -0700
   **From:** Squadra Nuvolari <snuvo4@gmail.com>
       **To:** Scott Mele <scottm@tek-tite.com>

Scott,

Understand, let go with this:

Sirius Signal  LLC,     Test, Inspect, and replace batteries regularly.
Patents# D7202475; 6,168,288, & Pend.    Model C-1001


Anthony

28.    Then, on March 30, 2015, Gunderson informed Mele that Sirius was going to modify the design to use a 4 layer board with the bottom being the battery contact. Gunderson provided a sketch of the new assembly (reproduced below) and noted the design "is intended to be simpler, more robust and sturdier; it is closer to your design."



29.     Tektite became a manufacturer for Sirius. In fact, Sirius appointed Mele the "Director of Manufacturing" and Tektite manufactured products for Sirius until August 2023.

30.     Sirius launched the C-1001 in 2015. The C-1001 was manufactured by Tektite but sold exclusively by Weems & Plath. For example, Weems & Plath started selling the C-1001 on Amazon.com on August 15, 2015.



Roll over image to zoom in

**Weems & Plath C-1001 SOS Distress Light with Day Signal Flag**

Visit the WEEMS & PLATH Store

4.5 ★★★★☆ ⌄   328 ratings | Search this page

**Currently unavailable.**
We don't know when or if this item will be back in stock.

| Light Source Type | LED |
| Power Source | Battery Powered |
| Brand | WEEMS & PLATH |
| Number of Batteries | 3 C batteries required. |
| Are Batteries Included | No |

**About this item**
- USCG compliant for DAY and NIGHT use with a daytime distress signal flag (included). 33 CFR 175.130
- LED light flashes up to 60 hours on C-cell batteries (3)
- Patented lens shines horizontal and vertical beams
- Visible up to 10 nautical miles
- Safe to operate -- NO danger to person or vessel

› See more product details

(*See* https://www.amazon.com/Weems-Plath-C-1001-Distress-Signal/dp/B0141VOX24). At least until in or around April 2016, the C-1001 product included a patent marking identifying the '288 Patent.

31.     In or around 2019, Sirius launched a variation of the C-1001, which it coined the C-1003. While there were cosmetic changes, the electronics of the C-1003 were not materially changed.

32.     Upon information and belief, Sirius never marked any of its products with a Sirius utility patent number.

**The '114 Patent and Its Family History**

33.     The '114 Patent issued on March 12, 2019, and is entitled "Visual Distress Signal Device." The '114 Patent issued from U.S. Patent Application No. 16/004,987 (herein, "the '987 App."), which was filed on June 11, 2018. The '114 Patent identifies only Anthony W. Covelli and Robert B. Simons, Jr. ("Simons") as inventors. Each of the '114 Patent claims are directed to a floatable visual distress signal device. A true and correct copy of the '114 Patent is attached hereto as **Exhibit B**.

34.     The '987 App. ultimately claims priority, through a string of patent applications, to U.S. Application No. 29/493,224, (herein "the '224 App."), which was filed on June 6, 2014 and which issued as a design patent, No. D720,247 ("the D247 Patent") (the entire family collectively referred to as "the Sirius IP"). The D247 Patent identifies just Covelli and Simons as inventors. A true and correct copy of the D247 Patent is attached hereto as **Exhibit C**. The patent includes just 8 figures depicting the exterior view of an eVDSD. Exemplary figures 1 and 2 are reproduced below:



FIG. 1                    FIG. 2

35.     U.S. Patent Application No. 14/561,197 ("the '197 App"), was filed on December 4, 2014, and issued as U.S. Patent No. 9,171,436 ("the '436 Patent"). The '197 App. is a continuation-in-part of the '224 App. The '436 Patent identifies just Covelli and Simons as inventors. A true and correct copy of the '436 Patent is attached hereto as **Exhibit D**.

36.     U.S. Application No. 14/923,263 ("the '263 App"), was filed on October 26, 2015 as a continuation-in-part of the '197 App. The '263 App. was abandoned. U.S. Patent Application No. 15/095,727 ("the '727 App"), was filed on April 11, 2016 as a continuation-in-part of the '263 App. The '727 App. issued as U.S. Patent No. 9,682,754 ("the '754 Patent"). While the published '263 App. identifies Covelli, Simons, and Gunderson as inventors, the '754 Patent identifies only Covelli and Simons as inventors. A true and correct copy of the '754 Patent is attached hereto as **Exhibit E**.

37.     U.S. Application No. 15/624,033 ("the '033 App."), was filed on June 15, 2017. The '033 App. is a continuation of the '727 App. The published '033 App. identifies just Covelli and Simons as inventors.

38.     The '987 App. is a continuation of U.S. Application No. 15/624,033 ("the '033 App").

39.     In total, at least four patents have issued in this family, including the D247 Patent, the '436 Patent, the '754 Patent, and the '114 Patent (herein "the Sirius Patents").

40.     Continuations-in-part signify that new subject matter was added to the disclosures of the patent application, i.e., additional information than was disclosed in the application to which priority is claimed. Therefore, during prosecution, and prior to the filing of the '987 App., which became the '114 Patent, new disclosures were added to the patent family on at least three separate occasions when certain continuations-in-part noted above were filed. Specifically, new disclosure was added at least on December 4, 2014, on October 26, 2015, and April 11, 2016.

41.     For example, disclosure related to a circuit assembly that included a "pedestal" were first introduced with the filing of the '727 App. on April 11, 2016. At least one embodiment of the assembly first disclosed in the '727 App. includes a first circuit assembly 1310, a pedestal

1322, and a second circuit assembly 1320 positioned above the first circuit assembly 1310 and atop the pedestal 1322. FIG 45 of the '745 Patent, reproduced below, depicts such an assembly.



FIG. 45

42.     This assembly is claimed in the '114 Patent. For example, Claim 12 of the '114 Patent states the following, with limitations related to the above assembly italicized:

[12.P] A floatable visual distress signal device comprising

[12.1] a floatable body comprising a waterproof internal cavity and extending along a longitudinal axis;

[12.2] a lens member coupled to the floatable body;

[12.3] an electrical circuit disposed within the internal cavity, the electrical circuit comprising, in operable cooperation:

[12.4] a light source;

[12.5] a power source;

[12.6] a first electrical contact in electrical cooperation with a first terminal of the power source;

[12.7] a second electrical contact in direct physical contact with a second terminal of the power source;

[12.8] *a first circuit assembly having a central opening, the first circuit assembly located at a first axial position*; and

[12.9] *a second circuit assembly comprising the light source, the second circuit assembly located a second axial position above the first axial position*;

[12.10] *an elongated pedestal extending from a first end to a second end, the elongated pedestal formed of an electrically conductive material, the second end of the elongated pedestal forming the second electrical contact, and the elongated pedestal having a first portion comprising the first end and a second portion comprising the second end, the first portion extending through the central opening of the first circuit assembl*y; and

[12.11] the light source disposed at the first end of the elongated pedestal and so that light generated from the light source is emitted through the lens member.

43.     Issued Claim 12 of the '114 Patent issued from originally filed Claim 13 of the '987 App. During the prosecution, Claim 13 of the '987 App. was originally rejected on the grounds of obviousness over U.S. Patent Publication No. 2010/0026571 (Batty) in view of U.S. Patent Publication No. 2008/0247161 (Hulsey). In response to this rejection, Claim 13 was amended to add the following limitations, which are italicized above:

1.   "a first circuit assembly having a central opening, the first circuit assembly located a first axial position;"

2. "a second circuit assembly comprising the light source, the second circuit assembly located a second axial position above the first axial position;" and

3. "the elongated pedestal having a first portion comprising the first end and a second portion comprising the second end, the first portion extending through the central opening of the first circuit assembly."

44.     The Applicant further clarified that neither Batty nor Hulsey disclose said claim limitations, which was agreed to by the Examiner during an interview. Thereafter, the Examiner entered a notice of allowance, including allowance of pending claim 13 which issued as claim 12 of the '114 Patent.

<u>**COUNT ONE**</u>
**Declaratory Judgment of Non-Infringement**

45.     Tektite incorporates by reference the allegations in the foregoing paragraphs as if fully restated herein.

46.     This Claim is for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, and seeks a declaration that Tektite does not infringe at least claim 12 of the '114 Patent.  This Claim relates directly to the claim asserted by Sirius in the Amazon APEX Proceeding notice.  Specifically, Sirius alleges that Tektite infringes claim 12 of the '114 Patent by making, using, selling, offering to sell, and/or importing the Tektite SOSeFLARE (the "SOSeFLARE"). Tektite contends that it does not infringe the '114 Patent. Therefore, an actual controversy exists between the parties under Article III of the United States Constitution.

47.     Tektite has not directly or indirectly infringed, and does not directly or indirectly infringe, at least claim 12 of the '114 Patent, either literally or under the doctrine of equivalents.

48.     The accused SOSeFLARE (depicted below) does not infringe claim 12 of the '114 Patent (or any claims that depend from claim 12), either literally or under the doctrine of

equivalents, because it does not include at least the following claim limitation: "an electrical circuit disposed within the internal cavity, the electrical circuit comprising… a light source."



49.     More specifically, claim 12 of the '114 Patent requires, *inter alia*, 1) "a floatable body comprising a waterproof internal cavity and extending along a longitudinal axis," 2) a lens member coupled to the floatable body," and 3) "an electrical circuit disposed within the internal cavity, the electrical circuit comprising… a light source." The SOSeFLARE light source (i.e., a light emitting diode ("LED")) is not located within an "internal cavity" of the orange "floatable body." The images below illustrate the location of the LED relative to any "internal cavity" of the orange "floatable body."





50.     Tektite is entitled to a declaratory judgment that it does not directly or indirectly infringe at least claim 12 of the '114 Patent, either literally or under the doctrine of equivalents.

<u>COUNT TWO</u>
**Declaratory Judgment of Incorrect Inventorship**

51.     Tektite incorporates by reference the allegations in the foregoing paragraphs as if fully restated herein.

52.     Mele invented multiple concepts that are disclosed in the Sirius IP and claimed in the Sirius Patents (or pending Sirius IP). However, Mele has never been identified or listed as an inventor in any of the Sirius IP. Mele is being harmed by this failure at least because he is being accused of infringing a patent claim to which he should be a named inventor. If he was properly named as an inventor, he would have the right to make, use, offer to sell, and sell the patented invention, pursuant to 35 U.S.C. § 262, and therefore would not have to spend time and resources defending against such charges. In addition, because Mele is not identified as an inventor, he is unable to license the technology he invented to others.

53. Thus, an actual controversy exists as to the correct inventorship of the Sirius IP.

54. For example, Mele created an electronic circuit that comprised a first circuit assembly with a central opening, an electrically conductive screw, and a second circuit assembly located atop the screw to power an LED within a strobe light (herein "the Pedestal Circuitry Design"). In early 2015, Mele disclosed the Pedestal Circuity Design to Covelli and others at Sirius.

55. Covelli and others at Sirius acknowledged that the Pedestal Circuity Design was Mele's design. Covelli and others at Sirius decided to incorporate the Pedestal Circuity Design into their products.

56. Prior to Mele's disclosure of the Pedestal Circuity design, no one at Sirius, including Covelli and Simon, had filed a patent application disclosing the Pedestal Circuity Design.

57. Only after Mele's 2015 disclosure of the Pedestal Circuity Design did Covelli and others at Sirius file a patent application disclosing the Pedestal Circuity design. Specifically, the '727 App. filed on April 11, 2016 was the first application Sirius filed that disclosed the Pedestal Circuity Design. For example, the Mele's design can be seen in FIG. 45 of the '754 Patent, which issued from the '727 App. At least claims 7-8 of the '754 Patent claim an aspect of the Pedestal Circuitry Design.

58. Despite this additional disclosure being added to the '727 App. and claimed in the '754 Patent, Mele was not identified as an inventor.

59. The Pedestal Circuity Design was also included in the '033 and '987 Apps and claimed in at least Claim 12 of the '114 Patent. Indeed, Claim 12 issued only after Sirius argued to the Examiner that the Pedestal Circuity Design was not found in the prior art.

60.     Because Mele contributed to other ideas claimed in the '114 and '754 Patents (as well as other ideas claimed or disclosed in the Sirius IP filed on or after October 26, 2015), he should be added as an inventor to all Sirius IP filed on or after October 26, 2015.

61.     Given the long-standing relationship with Mele, his involvement as the Director of Manufacturing, and Sirius's acknowledgements of Mele's contributions (including at least the Pedestal Circuitry Design), Sirius's failure to identify Mele as an inventor on the Sirius IP could only reasonably be the result of (1) gross oversight or (2) a deceptive intent to deceive the USPTO.

62.     If the former, Mele should be added as an inventor to the Sirius IP to correct the inventorship pursuant to 35 U.S.C. § 256. If the later, the Sirius IP, including but not limited to the '114 Patent, should be held invalid and unenforceable for inequitable conduct.


## COUNT THREE
### Declaratory Judgment of Invalidity Due to Inequitable Conduct

63.     Tektite incorporates by reference the allegations in the foregoing paragraphs as if fully restated herein.

64.     During the prosecution of the applications in the '114 Patent family, Sirius knew of material prior art yet failed to disclose it to the USPTO, in violation of its duty of disclosure pursuant to 37 C.F.R. 1.56. In addition, Sirius filed terminal disclaimers during the prosecution of these applications, which suggests that prior art relevant to claims in one application would be equally relevant to one or more other applications.

65.     U.S. Patent No. 6,168,288 (herein the "'288 Patent"), which is entitled "Flashlight with Light Emitting Diodes," was filed on August 5, 1999, and issued on January 2, 2001. As discussed above, Covelli—one of the named inventors of the '114 Patent—was aware of the '288 Patent at least as early as March 20, 2015. The '288 Patent discloses an on/off switching

mechanism similar to that of the C-1001, which the activation of the light is done via rotation of the lens, i.e., an on/off lens switch. The '754 Patent claims such an on/off lens switch. Moreover, the '727 App., which matured into the '754 Patent, was filed in April 2016, after the launch of the C-1001 product. Covelli also approved the marking of its C-1001 with the '288 Patent. Yet, Covelli never disclosed the '288 Patent to the USPTO.

66.    Similarly, Covelli was aware of Tektite's products, including but not limited to the Strobe 3500, the NITE-FLIGHT light, and the TEKNA LITE 6 Strobe. Indeed, Covelli identified the Strobe 3500 as a basis for the design process initiated with Tektite in or around January 2015. In addition, these products were on the market since at least 2013. In addition, the circuit design that is claimed in Claim 12—and was specifically used to traverse a rejection by the Examiner— was used in the NITE-FLIGHT light prior to any use or disclosure by Sirius. A similar circuit design was used in the TEKNA LITE 6 Strobe prior to any use or disclosure by Sirius. Despite the materiality of these products, none of these Tektite products were ever disclosed to the USPTO.

67.    Covelli was also aware of third-party patents and products. Indeed, Mele informed Covelli that their design was similar to U.S. Patent No. D205,973, to the SAF-T Beacon product, and to the CARCLO design. Despite this, none of these patents, products, or publications were disclosed to the USPTO.

68.    In addition, Covelli became a member of the USCG Special Committee 132 (the "132 Committee"), which is a committee of the Radio Technical Commission for Maritime Services ("RTCM"). Upon information and belief, Covelli obtained information from these committee meetings and improperly used this information to fraudulently attempt to patent eVDSD products that he did not invent, by falsely claiming inventorship of the eVDSD devices.

69.     Upon information and belief, Covelli also learned of material information from the '132 Committee that it used in its patent disclosure but failed to submit to the USPTO during prosecution of the Sirius IP including, without limitation: 1) the USCG Distress Signal Regulations that dictate the specifications of any USCG approved eVDSD; 2) the 2018 RTCM Standard; and 3) material relating to Covelli's work on the RTCM Committee.

70.     On information and belief, applicants/assignees also knew of U.S. Design Patent No. D205,973, entitled "Marine Signal Flare," which was filed on October 23, 1965 and issued on October 11, 1966 (herein "the D973 Patent"), and of U.S. Design Patent No. D210,857, entitled "Electric Highway Signal Flare," which was filed on July 19, 1967 and issued on April 23, 1968. Each of these disclosed a design materially similar to that disclosed in the D247 Patent.

71.     In fact, no Information Disclosure Statement ("IDS") was filed with the '224 App., the '197 App., or the '263 App. The first time an IDS was filed in this patent family was on April 11, 2016 in connection with the '727 App. This IDS identified only 5 patents, 5 publications, and two foreign patent documents but did not disclose any of the prior art identified herein. Sirius identified more art, for a total of 7 U.S. patents, 10 U.S. patent publications, and 2 foreign patent documents with the '033 App. and '987 App., but again did not disclose any of the prior art identified herein. Indeed, Sirius never identified any product or non-patent literature to the USPTO.

72.     Therefore, the applicants and assignees of the applications that eventually led to the Sirius Patents knew of material prior art prior to the issuances of the D247, the '436, the '754, and the '114 Patents yet failed to disclose that information to the United States Patent and Trademark Office ("USPTO") in violation of their duty to disclose under 37 C.F.R. 1.56.

73.     Covelli or others agents of Sirius would have known that disclosing these material references would have impacted their ability to get the allowed claims. By way of example, the electronic circuitry used in the NITE-FLIGHT light, and TEKNA LITE 6 Strobe was the same as or substantially similar to the Pedestal Circuitry Design that is claimed in Claim 12 of the '114 Patent and was used to traverse a prior art rejection. Indeed, after receiving the notice of allowance of Claim 12 based on its amendments to add the Pedestal Circuitry Design, Sirius would have known these references were highly material to patentability. If Sirius disclosed the material aspects of these product's designs, the Examiner would not have allowed Claim 12, as currently written.

74.     The only reasonable inference for Sirius's failure to disclose, in violation of their duty, was an intent to deceive the USPTO. In addition, and to the extent it was not a gross oversight, Sirius's failure to identify Mele as an inventor on claims related to the Pedestal Circuitry Design and other Mele designs is also evidence of an intent to deceive.

75.     Accordingly, each of the patents in the family—including the D247, the '436, the '754, and the '114 Patents—should be held unenforceable.

## COUNT FOUR
### Declaratory Judgment of Invalidity

76.     Tektite incorporates by reference the allegations in the foregoing paragraphs as if fully restated herein.

77.     One or more claims of the '114 Patent, including at least Claim 12, is invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

78.     The '114 Patent's claims are directed to a floatable visual distress device. For example, multiple prior art references related to the field of floatable visual distress signal devices

disclosed the claimed elements and it would have been obvious to a person of ordinary skill in the art ("a POSA") to combine these elements to arrive at the claimed invention.

79.     Several products on the market prior to the filing of any Sirius IP included a visual distress signal having an body comprising an internal cavity and extending along a longitudinal axis, a lens member coupled to the body; an electrical circuit disposed within the internal cavity, the electrical circuit comprising, in operable cooperation: a light source; a power source; a first electrical contact in electrical cooperation with a first terminal of the power source; and a second electrical contact in direct physical contact with a second terminal of the power source.

80.     For example, the Strobe 3500, NITE-FLIGHT light, and TEKNA LITE 6 Strobe each included these elements. Each included a battery powered light affixed to a body containing the electrical circuit (which includes a first and second electrical contact in contact with the power source, as is required to complete an electrical circuit). Each also included a lens coupled to the body. At least the TEKNA LITE 6 Strobe (pictured below) was also floatable. The STROBE 3500 was also floatable when used with Tektite's AA battery adaptor.



Floatable body containing electrical circuit and power source

Light Source

Lens

81.     As described herein, the NITE-FLIGHT light uses the Pedestal Circuitry Design (and the Tektite Lite 6 LED Strobe used a similar circuitry). This Pedestal Circuitry Design included a first circuit assembly having a central opening, a second circuit assembly comprising the light source positioned above the first circuit assembly, and an elongated pedestal (or screw) therebetween. The screw was comprised of an electrically conductive material. The head of the screw was in direct contact with the power source (or battery). The body of the screw extended through the central opening of the first circuit assembly and the second circuit assembly (which included the light) sat atop the end of the screw body such that the light would emit through the lens member.

82.     It would have been obvious, at least as of the priority date of the '114 Patent to combine the floatable body of the TekTite Lite 6 LED Strobe with the circuit design of the NITE-FLIGHT light. A POSA would have been motivated to do so in order to secure and affix the light source further into the lens in order to provide more visibility of the light. A POSA would have had reasonable success as it would have involved switching out one electrical circuit assembly for another of a limited number of available design choices.

83.     Therefore, at least Claim 12 is rendered obvious and invalid by available prior art.


## RECITALS

WHEREFORE, Tektite demands that judgment be entered against Defendant and asks the Court to award the following relief:

       a.     A determination that Scott Mele is properly named as an inventor on all Sirius IP filed after February 2015, including the '114 Patent;

b.  A determination that Tektite does not infringe a valid claim of the '114 Patent;

c.  A determination that Sirius and its agents have intentionally deceived the USPTO through inequitable conduct;

d.  A determination that the '114 Patent, the '754 Patent, the '436 Patent, and the D247 Patent are unenforceable due to Inequitable Conduct;

e.  A determination that the '114 Patent and the '436 Patent are unenforceable for failure to name the correct inventor.

f.  Costs and attorneys' fees; and

g.  Such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury in this action of all issues so triable.

Dated: May 9, 2024

By: /s/ *Paul W. Kalish*
Paul W. Kalish, Esq.
Ryan North Miller, Esq.
**FOX ROTHSCHILD LLP**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Tel: (609) 896-3600
Fax: (609) 896-1469
pkalish@foxrothschild.com

*Attorneys for Plaintiff Tektite Industries, Inc.*

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

Plaintiff, through its attorneys, certifies that other than the Amazon APEX proceeding described above, the matter in controversy is not the subject of any other action pending in any court, or any pending arbitration or administrative proceeding.

Dated: May 9, 2024                    <u>/s/ *Paul W. Kalish*      </u>
                                      Paul W. Kalish


## <u>CERTIFICATION PURSUANT TO L. CIV. R. 201.1</u>

The undersigned hereby certifies that the matter is not subject to compulsory arbitration because Plaintiff seeks primarily declaratory judgment relief.

Dated: May 9, 2024                    <u>/s/ *Paul W. Kalish*      </u>
                                      Paul W. Kalish